Peterson and others, Plaintiffs and Appellants, v. Sinclair
Refining Company, Defendant and Respondent:
Bougie, Defendant and Respondent: Integrity
Mutual Insurance Company, Defendant and Appellant.

*September 3—October 1, 1963.*

For the appellants there was a brief by *Smith, Smith & Roels* of DePere, and *Kaftan, Kaftan & Kaftan* of Green Bay, for John and Verna Peterson, and by *Harry Hoeffel* of Appleton, for the Rural Mutual Insurance Company, and oral argument by *J. R. Kaftan.*

For the appellant Integrity Mutual Insurance Company there was a brief by *Everson, Whitney, O'Melia & Everson* of Green Bay, and oral argument by *E. L. Everson.*

For the respondent Sinclair Refining Company there was a brief by *Welsh, Trowbridge, Bills, Planert & Gould* of Green Bay, and oral argument by *Richard J. Gould.*

For the other respondents there was a brief by *Evrard, Evrard, Duffy, Holman & Faulds* of Green Bay, for Norbert Bougie, by *Hoeffel & Coughlin* of Appleton, for the Rural Mutual Insurance Company; and by *Smith, Smith & Roels* of DePere, and *Kaftan, Kaftan & Kaftan* of Green Bay, for John and Verna Peterson, and oral argument by *James R. Faulds.*

WILKIE, J.   Since there are two separate appeals we will consider them separately.

### *Liability of Sinclair Refining Company.*

The primary issue raised in the appeal by the Petersons and their insurer, Rural Mutual, may be stated as follows: Did the contract between the Petersons and Sinclair for the sale and delivery of fuel oil contain an implied promise of safe delivery which could not be avoided by hiring an independent contractor to make physical delivery and which promise, in the event of unsafe delivery, could give rise to liability on the part of Sinclair for damages to the Petersons and their insurer, Rural Mutual?

The relationship between the Petersons and Sinclair regarding the fuel oil delivered to the Peterson home on December 9, 1959, was established by Mrs. Peterson's phone call to the Sinclair terminal in Green Bay on the morning of the accident. She ordered the fuel oil in the name of her husband. The testimony of Bougie and James Smith, branch manager of Sinclair in Green Bay, reveals that when a customer placed an order with the branch office, a clerk at the office prepared an "order notice" and placed this notice in the pigeonhole box of the driver who normally serviced the customer. Because the testimony reveals that from 1939

until the date of the accident Bougie handled all but a few deliveries of Sinclair products to the Petersons, it is reasonable to believe that Bougie received Mrs. Peterson's order via the order notice in his pigeonhole box. Hence, the phone conversation established a contract for sale and delivery of fuel oil. Bougie's trip on the afternoon of December 9th was an incident in the performance of the contract between Sinclair and Peterson.

Did the agreement contain an implied promise of safe delivery which, if breached, would give rise to a tort action based upon the contractual obligation? [1] Based upon the substance of the conversation and the conduct of Sinclair pursuant to Mrs. Peterson's order, an "implication in fact" cannot be found. The Sinclair employee who received the order made no express statements guaranteeing the safety of the customer against the risks of careless delivery. The mere fact of physical delivery does not imply a promise to minimize dangers arising out of the movement of combustible materials. However, a promise of safe delivery can be "implied in law."

When the court implies a condition or promise "in law," it is imposing this factor upon the parties regardless of their original intentions and in order to accomplish substantial justice in a given set of circumstances. [2]

What are the circumstances of this case which justify the "implication in law" of Sinclair's promise of safe delivery?

The Petersons had purchased most of their petroleum products from Sinclair since 1939. From 1939 until 1959 the pattern of transactions reveals that the customers reasonably believed that at all times they were dealing with Sinclair, with its general commercial reputation being a factor in every transaction. The Petersons placed most of

[1] *Colton v. Foulkes* (1951), 259 Wis. 142, 47 N. W. (2d) 901.
[2] 3 Corbin, Contracts, pp. 276–280, sec. 561.

their orders directly with the Sinclair terminal; the invoices were prepared by Sinclair; the bills originated in Sinclair's office; when the Petersons paid by check, it was made payable to Sinclair; if they received a receipt from the driver for a cash payment, the receipt would designate him as the "representative" of the company. When the Petersons had technical trouble with their fuel oil furnace, a Sinclair representative suggested mechanical changes. The delivery truck bore the trade color of Sinclair green and the trade name was painted upon the truck. The driver wore Sinclair uniforms and insignia. On this pattern of dealing, the Petersons believed that they were dealing with Sinclair when they purchased petroleum products, and Sinclair took numerous steps to reinforce this belief.

Sinclair knew that different petroleum products were simultaneously delivered in a single truck, with the attendant chance of misdelivery and the risk of accident that followed that mode of delivery.

Joint delivery of gasoline and fuel oil was necessary if the company was to efficiently service those customers who needed both products. A requirement of two trips would unnecessarily increase the distribution costs. Given a pattern of dealing in which the customer may reasonably believe that he is dealing in all dimensions of transactions in petroleum products with Sinclair, and given Sinclair's knowledge of a risk-creating method of delivery, it follows that the court may imply in law a promise of safe delivery in the contract established by the phone conversation on the day of the accident.

This court has recognized that the breach of a contractual duty may give rise to a tort action predicated upon failure to carry out the contractual promise to the other party to the agreement.

In *Colton v. Foulkes* (1951), 259 Wis. 142, 47 N. W. (2d) 901, the court quoted approvingly from 38 Am. Jur., Negligence, p. 661, sec. 20, at page 146:

" '*Predicating duty upon contract.* Ordinarily, a breach of contract is not a tort, but a contract may create the state of things which furnishes the occasion of a tort. The relation which is essential to the existence of the duty to exercise care may arise through an express or implied contract. Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. In such a case, the contract is mere inducement creating the state of things which furnishes the occasion of the tort. In other words, the contract creates the relation out of which grows the duty to use care. Thus, a person who contracts to make repairs can be held liable for his negligence in doing the work. Although, as a general rule, mere failure to perform a contract cannot serve as the basis of a tort liability for negligence, and there are authorities which state that liability for negligence in the violation of a duty imposed by contract involves misfeasance rather than nonfeasance, the tendency has been to recognize that liability for negligence may be predicated upon a lack of due care in failing to act as well as upon a negligent performance. The sound rule appears to be that where there is a general duty, even though it arises from the relation created by, or from the terms of, a contract, and that duty is violated, either by negligent performance or negligent nonperformance, the breach of the duty may constitute actionable negligence.' " [3]

This general rationale was reinforced in *Presser v. Siesel Construction Co.* (1963), 19 Wis. (2d) 54, 58, 119 N. W. (2d) 405:

---

[3] See also Restatement, 2 Torts, p. 1030, sec. 385, and comment *b*, p. 1031.

"This court has held the negligent performance or nonperformance of a duty created by a contract may constitute actionable negligence. *Colton v. Foulkes* (1951), 259 Wis. 142, 47 N. W. (2d) 901."

The trial court's conclusion of law, to wit:

"2. The duty of delivering petroleum products from seller to buyer may be delegated to an independent contractor,"

takes the view that even if an implied condition of safe delivery could be found in the agreement, this duty could be delegated to an independent contractor. This court has held that a contractual obligation to protect the safety of others cannot be allocated to an independent contractor.

In *Presser v. Siesel Construction, supra,* Siesel, a general contractor entered into a contract with the federal government to do remodeling work at a Nike site. Under the terms of the contract with the government, Siesel was obligated to comply with all pertinent provisions of the "General Safety Requirements" manual in order to provide for the safety of the employees and other persons. Siesel subcontracted all the details of construction to 15 subcontractors. An employee of a subcontractor was injured as a result of the active negligence of its employer-subcontractor. Siesel claimed that because it was not actively negligent, and because the injury was not the result of a latent defect for which it had given no warning, it was not liable. The court rejected its claim, at page 58:

"The basis of Siesel's liability as found by the verdict was negligence in the manner of performing the contract with the government. Siesel contends it, as a general contractor subcontracting all the work, had only a common-law duty to warn of latent defects and not to place a barricade around the Nike elevator at the magazine level. There is a conflict of authorities whether the duty required for a negligence action can be predicated upon a contract. See Annos. 38 A. L. R. 403, 492, 493, and 69 A. L. R. 522. This court

has held the negligent performance or nonperformance of a duty created by a contract may constitute actionable negligence. *Colton v. Foulkes* (1951), 259 Wis. 142, 47 N. W. (2d) 901. Restatement, 2 Torts, p. 1030, sec. 385. We do not accept the rationale of *Foster v. Herbison Construction Co.* (1962), 263 Minn. 63, 115 N. W. (2d) 915, and *Larson v. Heintz Construction Co.* (1959), 219 Or. 25, 345 Pac. (2d) 835, that the contract is only one factor bearing on the question of ordinary care under the circumstances. It imposes the standard of care and the obligation to the plaintiff. A general contractor by contract may assume a duty of care for the benefit of others than the promisee over and above such common-law liability for negligence which would otherwise be applicable to the facts. The contract between Siesel and the government in Article 28, Accident Prevention (A), obligated the contractor to comply with all pertinent provisions of the "General Safety Requirements" manual in order to provide for the safety of the employees and other persons.

"These duties thus assumed by Siesel as general contractor cannot be delegated or assigned by subcontracting the work."

In *Medley v. Trenton Investment Co.* (1931), 205 Wis. 30, 236 N. W. 713, the plaintiff and defendant stood in the contractual relationship of landlord and tenant. The defendant, landlord, hired an independent contractor to do exterminating work. Because of the careless manner in which the work was done, poisonous fumes seeped into the plaintiff's rooms causing his wife's death. The defendant argued that the duty of reasonable care had been totally allocated to an independent contractor. Accepting the exterminator as an independent contractor, the court said, at pages 36, 37, and 40:

"As between owners and principal contractors and third persons, it seems clear, under our decisions, that the owner or principal contractor is not liable for the negligent acts of an independent contractor unless the act to be done or the work to be performed is inherently dangerous or naturally

or necessarily creates the nuisance or the defect or necessarily or naturally results in injury. . . .

"All of the cases just cited . . . [no liability for work performed by independent contractor] involved situations arising between owners or principal contractors and third persons. In none of these cases did a relation exist in which the owner or principal contractor owed a special duty to the persons injured. In the case at bar the relation between the defendant and Mrs. Medley was that of landlord and tenant. In that situation it seems quite clear, under our decisions, that the defendant owed to her a special duty to use reasonable care to protect her from injury on introducing into the building a dangerous gas, . . .

"We therefore conclude, under the circumstances shown by the evidence, that the defendant, as landlord, owed to the Medleys, its tenants, a duty to use reasonable care to protect them from injury when it introduced into the building a dangerous gas . . . although such work was done by an independent contractor, . . ."

In this context, the term "special duty" of reasonable care meant a duty created by the contractual relationship of landlord and tenant. A duty of reasonable care created by contract cannot be allocated to an independent contractor in a relationship with a party to the contract.

Therefore, if Bougie's misdelivery of the gasoline and his responses to this situation are deemed to be a breach of the promise of safe delivery, or if Sinclair's awareness of the method of delivery and subsequent failure to require a visible and continual identification of the liquids in each compartment is deemed to be a breach, then the plaintiff has stated a cause of action on a contract theory. The trial court did not determine whether the conduct of Bougie or Sinclair constituted a breach of the promise of safe delivery because (1) it found no condition implied in law, and (2) alternatively it found that if such duty existed it could be delegated to an independent contractor. Both of these conclusions are erroneous.

Because of our holding on this issue, it is unnecessary to consider two further issues raised in the first appeal urging alternative theories under which Sinclair could be held liable to the plaintiffs for acts of negligence on the part of Bougie in making the fuel oil misdelivery to the Petersons. These issues are:

(1) Was the physical delivery of petroleum products in a manner in which the misdelivery of gasoline for fuel oil is a probable occurrence, a nondelegable duty which could not be allocated to an independent contractor?

(2) Under the circumstances of this case, was Norbert Bougie an employee of Sinclair or an independent contractor?

Thus we hold that the trial court was in error in dismissing the causes of action of the plaintiffs against the defendants, based on the theory of a breach of contractual duty for safe delivery of the fuel oil. Since the plaintiffs' causes of action founded on this theory state a valid cause of action it is unnecessary to consider the merits of the other causes of action founded in tort. As between the principal defendants, Sinclair and Bougie, the issues contained in their cross complaints against each other and responsive pleadings thereto remain unaffected by our determination here and subject to further proceedings.

### Coverage of Bougie Under Insurance Policy of Integrity Mutual Insurance Company.

The sole issue in the appeal of Integrity Mutual Insurance Company may be stated as follows: Given an automobile liability policy insuring a petroleum product tank delivery truck, and containing a standard loading and unloading clause insuring against damage resulting from erroneous delivery of liquid products, but excluding liability for accidents arising out of erroneous delivery of one liquid product for another, if such accident occurs after "such operations

have been completed or abandoned at the place of occurrence," is the insurer liable when the insured mistakenly misdelivers gasoline for fuel oil into a fuel oil storage tank, and upon discovering his error takes steps to remove the gasoline from the fuel oil storage tank and is preparing to deliver fuel oil into the fuel oil storage tank, when a damage-producing explosion occurs?

The automobile liability policy issued by Integrity to Bougie covering the truck used in delivery of the fuel oil and gasoline to the Petersons contained a standard loading and unloading clause:

"Use of the automobile for the purposes stated includes the loading and unloading thereof."

The policy also contained the following exclusion clause:

"It is agreed that the insurance afforded by the policy for bodily injury liability and for property damage liability does not apply to accidents arising out of the delivery of any liquid product into a wrong receptacle or the erroneous delivery of one liquid product for another, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof. Such operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

Integrity contends that the phrase "such operations" refers only to the acts of misdelivery. Therefore, at the moment the insured realizes he has made an erroneous delivery and ceases, for example, to deliver gasoline instead of fuel oil, and begins preparations to correct his error, the exclusion clause is operative.

Under the facts of this case, therefore, Integrity's position is that coverage on the policy ceased when Bougie terminated delivery of the gasoline into a fuel oil storage tank. Integrity predicates this interpretation upon a rule of grammatical con-

struction—the last-antecedent rule. " 'Relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and are not to be construed as extending to or including others more remote unless such extension is clearly required by a consideration of the entire act. 36 Cyc. 1123.' " [4] Therefore, because the phrase "such operations" appears immediately after the phrase, "arising out of the delivery of any liquid product into a wrong receptacle or the erroneous delivery of one liquid product for another," accidents occurring after the delivery of the wrong liquid has ceased, but before the proper liquid is placed in the receptacle, are excluded from coverage, even though the driver and truck may be in close physical proximity to the scene of the accident.

This court has consistently followed Mr. Justice HOLMES' epigrammatic direction to "think things rather than words." The linguistic rule of construction must be viewed in the context of the entire contract.

"The rule is that qualifying or limiting words or clauses in a statute are to be referred to the next preceding antecedent *unless the context or the evident meaning of the enactment requires a different construction.*" [5] (Emphasis added.)

The term "such operations" can be reasonably construed to refer to the total process of attempting to deliver petroleum products into their proper containers. A driver who discovers that he has made an erroneous delivery, will obviously attempt to correct the error. This very attempt to remove a volatile liquid from a container creates a substantial risk as the facts of this case demonstrate. Therefore, Integrity's construction would sharply circumscribe the area of insured risk. This is an unreasonable result in circumstances which

[4] *Charette v. Prudential Ins. Co.* (1930), 202 Wis. 470, 473, 232 N. W. 848.

[5] *Jorgenson v. Superior* (1901), 111 Wis. 561, 566, 87 N. W. 565.

show that the driver removed the volatile liquid from the container, so that he could deliver the "proper" liquid, and thus totally unload his order. His task was to get the right liquid in the appropriate container—and the term "such operations" is shorthand for that result.

More reasonably, abandonment and completion of "such operations" refers to a state of affairs where the driver of the truck physically leaves the unloading area, after erroneous delivery, thus creating a situation in which an intervening instrumentality, not insured by the driver's insurer, may provide a causal link in the chain leading to the accident.

This construction is reinforced by the last sentence of the indorsement:

"Such operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

This language clearly limits the force of the "completed operations" doctrine which would continue coverage until the right liquid was in the appropriate receptacle, regardless of whether the erring driver may have left the delivery area prior to correcting his mistake. If the driver remains on the premises, however, and attempts to make proper delivery which necessarily involves terminating "erroneous" delivery, he is reasonably completing the operation of unloading.

In the case at bar, Bougie never left the Peterson residence prior to the accident. After discovering that he was delivering gasoline into the fuel storage tank, he removed the gasoline from the tank in preparation for the delivery of the fuel oil. He cleared the gasoline from his hose, attached the hose to the faucet on the truck leading to the fuel oil compartment, and placed the nozzle of the hose adjacent to the fuel oil intake. These facts are evidence of his inten-

tion to deliver fuel oil before he left the premises. At this point the explosion occurred.

Under the above analysis, Bougie was in the process of delivering the proper product to the appropriate receptacle, and had not completed or abandoned the operation of unloading.

In any event, an analysis leading to the conclusion that the referent of "such operations" is "a continuing attempt to make proper delivery" rather than "erroneous delivery" is a reasonable construction of the indorsement.

By definition, an ambiguous exclusion clause is one capable of several reasonable constructions. Hence the rule of construing ambiguity against the insurer must apply.[6]

We conclude that by the terms of the policy, Bougie is covered for his erroneous delivery of gasoline for fuel oil and his attempts to correct the error.

*By the Court.*—Judgment reversed as to that part dismissing the allegations of plaintiffs' complaint, which predicate the liability of Sinclair Refining Company upon breach of contract. Judgment affirmed as to that part striking all allegations and denials of Integrity Mutual Insurance Company's answer as they relate to invoking an exclusion under the terms of the liability policy. Cause remanded for further proceedings not inconsistent with this opinion. Full costs allowed to plaintiffs to be charged equally against Sinclair Refining Company and Integrity Mutual Insurance Company; full costs allowed defendant and respondent, Norbert Bougie, to be charged against Integrity Mutual Insurance Company; 25 percent of its costs allowed defendant and respondent, Integrity Mutual Insurance Company, to be charged against Sinclair Refining Company.

---

[6] *Meiser v. Aetna Casualty & Surety Co.* (1959), 8 Wis. (2d) 233, 98 N. W. (2d) 919; *State Department of Public Welfare v. Central Standard Life Ins. Co.* (1963), 19 Wis. (2d) 426, 120 N. W. (2d) 687.