Mark R. TESMER, Plaintiff,

v.

**CHARTER FILMS, INC., Defendant.**

No. 05–C–309–C.

United States District Court,
W.D. Wisconsin.

Nov. 2, 2005.

---

See, also, 2005 WL 2671419.

John D. Finerty, Jr., Michael Best & Friedrich LLP, Milwaukee, WI, for Plaintiff.

Nicholas Ostapenko, Johnson, Killen & Seiler, P.A., Duluth, MN, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief or specific performance of a contract. Plaintiff Mark Tesmer is suing defendant Charter Films, Inc. for breach of contract, alleging that defendant breached its obligation to value his stock according to the procedures outlined in section 5(b) of the parties' stock repurchase agreement. Jurisdiction is present under 28 U.S.C. § 1332(a)(1).[1] Before the court are plaintiff's motion for summary judgment and

---

1. In an order dated October 18, 2005, I directed the parties to submit additional information regarding their diversity. In response, defendant asserts "on information and belief" that it believed plaintiff's home was for sale on the date the complaint was filed and that plaintiff might not have been a Minnesota citizen at the time this suit was initiated. Defendant produced no evidence supporting its contention. In a supplemental affidavit, plaintiff testified that at the time the complaint was filed, he was (and remains) a Minnesota resident. Therefore, this court has jurisdiction under 28 U.S.C. § 1332(a)(1). *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004)(all challenges to subject-matter jurisdiction premised upon diversity measured against state of facts at time of filing).

defendant's renewed motion to dismiss plaintiff's motion pursuant to Fed.R.Civ.P. 56(f). Because I find that section 5(b) applies to the purchase of plaintiff's stock, I will grant his motion for summary judgment and order defendant to comply with the procedures outlined in the agreement. I will deny defendant's motion as unnecessary.

From the parties' proposed findings, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff Mark Tesmer is an adult citizen of the state of Minnesota. Defendant Charter Films, Inc. is a privately held corporation, incorporated under the laws of the state of Wisconsin, with its principal place of business in Superior, Wisconsin. The value of the stock shares at issue in this case exceeds $75,000.

Defendant manufactures plastic film. From approximately December 23, 1998 until February 18, 2005, plaintiff was employed by defendant in Superior, Wisconsin and was responsible for overseeing the sales department, hiring sales staff and assisting them in serving customers and expanding sales of defendant's products. Plaintiff was not responsible for researching, developing, manufacturing or distributing defendant's products.

On December 29, 1998, plaintiff paid defendant $50,000 to purchase 50 shares of Class A voting common stock and 450 shares of Class B non-voting common stock of the company. At present, plaintiff owns 10% of the company. When plaintiff bought his stock shares, he executed a "Stock Repurchase Agreement."

On April 1, 1999, at defendant's request, the original stock repurchase agreement was replaced with a document entitled "Amended and Restated Stock Purchase Agreement" (hereinafter "the agreement"). This is the only contract that exists between the parties.

Section 5(b) of the agreement reads as follows:

5. *Death of a Shareholder.*

\* \* \* \* \* \*

(b) *Death After Three Years from the Date of this Agreement.* If a shareholder dies after the third anniversary of the date of this agreement, the personal representative of the estate of the deceased shareholder shall sell to the company, and the company shall purchase from such personal representative, the stock owned by the deceased shareholder's estate at a purchase price equal to the fair market value of such stock as of the end of the company's most recent fiscal year ending prior to the date of the shareholder's death. The purchase price shall be paid in cash at closing which shall occur within 60 days after the appointment of the personal representative of the estate of the deceased shareholder or such other time and place as the parties to the purchase and sale may agree. For purposes of this agreement, "fair market value" shall be determined pursuant to good faith negotiations between the parties to the purchase and sale.

At any time during this negotiation process, either party to the purchase and sale may give written notice to the other party indicating the purchase price per share that such a party is willing to apply to the purchase and sale ("the proposed purchase price per share"). Within 30 days of receiving such notice, the other party to the purchase and sale shall elect to either complete the purchase and sale using the proposed purchase price per share or require that an appraisal be conducted by an appraiser mutually agreeable to the purchaser and

seller, which appraiser shall determine the fair market value of the stock. If the purchaser and seller cannot agree upon an appraiser, they shall each name a third appraiser who shall perform the appraisal. The determination made by the appraiser shall be final and binding on all interested parties.

The appraiser shall determine the fair market value of the stock based on the cash or cash equivalent price at which a willing buyer would buy and a willing seller would sell the stock, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts; provided, however, that the appraiser shall not apply any discount from the fair market value due to lack of marketability or minority interest.

Stock Purchase Agreement, dkt. # 9, exh. A at 7–8.

Section 7 of the agreement provides:

7. *Termination of Employment After Five Years and Not for Cause.* If at any time after the fifth anniversary of the date of this agreement, a shareholder's employment with the company terminates for any reason, other than death or disability or termination by the company for cause, the terminated shareholder shall sell and the company shall purchase all of the terminated shareholder's stock. The purchase price for such stock shall equal the stock's fair market value as of the end of the company's most recent fiscal year ending prior to the termination of the employment. The purchase price shall be paid in cash at closing (which shall occur on a date set by the company which is within 30 days after the date of termination) or, if the purchase price is in excess of $50,000, the company may elect to pay the purchase price as follows: 10% in cash at closing and the balance over five years in equal annual installments of principal, plus interest, at 8% per annum on the outstanding balance until paid in full, with the first payment payable on the first anniversary of closing and the remaining four payments paid on each of the four anniversaries thereafter.

*Id.* at 9.

Section 8 of the agreement provides:

8. *Disability.* If any shareholder who is an employee of the company suffers a disability, within 90 days thereafter, the disabled shareholder or his or her personal representative shall sell to the company and the company shall purchase from such disabled shareholder or his or her personal representative, the disabled shareholder's stock at the purchase price and under the terms and conditions of section 5, substituting the date of the disability for the date of death.

*Id.* at 9–10.

On February 18, 2005, plaintiff resigned. He is not disabled. On March 3, 2005, plaintiff met with defendant's Executive Vice President Todd Johnson and Chief Operating Officer Chris Trapp to discuss the company's repurchase of plaintiff's stock shares. At the meeting, defendant presented plaintiff with three documents entitled "Fair Market Value Calculation," "Payout Structure," and "Charter Films Earning Summary." Defendant contended that the company's total value in outstanding stock shares was $17,674,228, based upon the company's "book value" plus accumulated depreciation. Defendant asserted that plaintiff's stock shares were worth $1,764,228. Plaintiff rejected this proposed repurchase price in a letter dated March 11, 2005.

On March 21, 2005, plaintiff met again with Johnson and Trapp to discuss defendant's repurchase of his stock shares. De-

fendant maintained its position that the correct value of the stocks was $1,764,228. On April 1, 2005, plaintiff mailed a letter to defendants in which he proposed that his stock's fair market value was $6.2 million. Plaintiff based his proposed purchase price on a press release regarding a publicly reported 2005 transaction in which Appleton Paper purchased New England Extrusion for an amount equal to 1.36 times the value of New England Extrusion's sales. In the April 1 letter, plaintiff designated American Appraisal and Emory Business Valuations as possible appraisers. Defendant responded to plaintiff's correspondence in a letter dated April 4, 2005. In the letter, defendant revoked all outstanding offers and stated, "We intend no further effort to resolve your outstanding matter at this time."

On April 18, 2005, plaintiff's attorney, John Finerty, Jr., sent a letter to defendant's attorney, Vincent J. Beres. Finerty wrote:

> It occurred to me after we hung up the phone that there is a 30–day time limit by which a party may designate an appraiser and elect to set the fair market value of the company by appraisal. Arguably, Todd Johnson's letter dated March 21, 2005, would trigger the 30 day time limit. I would kindly ask that you confirm that Charter waives the time limit for the purposes of negotiations for up to 30 days. If our clients reach an impasse, I would be happy to designate an appraiser that, hopefully, we could agree upon. If not, the contract contains a mechanism for resolving the question of how to value the company.

Letter from Finerty to Beres, Apr. 18, 2005, dkt. # 14, exh. C. On April 26, 2005, Finerty wrote again to Beres, this time designating John D. Emory, Sr. of Emory Business Valuations as the appraiser plaintiff chose to value the company.

On April 29, 2005, plaintiff met again with Johnson. During the meeting, Johnson admitted that he had conducted no market research to determine the company's fair market value. He reiterated the company's earlier offer of $1,764,228. Plaintiff asked to see the financial statements defendant had used to calculate its adjusted book value. Johnson refused to provide them, stating that the adjusted book value was "a straight forward calculation" representing a "60% premium over book value." In addition, Johnson told plaintiff, "At the end of 2004, Charter had $11 million in equity and your request for $5 million would represent 50% of the company. I couldn't pay that even if I wanted to."

Once again, on May 13, 2005, plaintiff sent defendant a letter requesting that defendant either accept his proposed purchase price per share or designate an appraiser. Defendant replied in a letter dated May 20, 2005, but did not accept plaintiff's proposed purchase price or designate an appraiser.

Plaintiff filed this lawsuit on May 27, 2005 and its motion for summary judgment on June 22, 2005. As of July 12, 2005, the parties had conducted no discovery.

## OPINION

### A. *Defendant's Renewed Motion to Dismiss Plaintiff's Motion for Summary Judgment*

■ Defendant asks the court to dismiss plaintiff's motion for summary judgment or, in the alternative, to order a continuance before deciding the motion to provide defendant with additional time to engage in discovery. Federal Rule of Civil Procedure 56(f) permits the court to refuse to enter summary judgment or provide a

continuance on a motion for summary judgment when "it appear[s] from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Defendant contends that it cannot properly respond to plaintiff's motion because material facts, primarily the fair market value of plaintiff's stock, require further investigation.

Defendant's motion fails for two reasons. First, defendant has not indicated that discovery, as opposed to diligent research, is likely to yield the information it seeks. The fair market value of its company's stock is a figure defendant is capable of discerning on its own without the assistance of discovery.

More important, to resolve plaintiff's motion for summary judgment, the court does not need to determine the fair market value of plaintiff's stock or examine any facts other than those the parties have proposed already. As Judge Crocker indicated in his order denying defendant's original motion to strike plaintiff's motion for summary judgment, plaintiff's motion "asserts that the parties' contract is unambiguous on all salient points... The issue whether the contract is ambiguous can be decided by the court without reference to additional documents or additional discovery by the parties." Order dated July 21, 2005, dkt. # 29, at 1. The parties agree that defendant is obligated to purchase plaintiff's stock at fair market value. They dispute the method for determining the fair market value and, consequently, the ultimate value of the stock. In his motion for summary judgment, plaintiff contends that the method for determining the fair market value is set forth in section 5(b) of the agreement. Additionally, he alleges that he has complied with those procedures. He asks the court to award him $6.2 million or, in the alternative, to order defendant to "comply with the terms of the agreement."

Plaintiff's motion reduces to a single question: Does the stock repurchase agreement set forth a binding method for resolving disagreements about the fair market value of the stock when the shareholder has voluntarily terminated his employment with the company? The question is one of contract interpretation that does not require extensive fact-finding to resolve. Therefore, I will deny defendant's motion as unnecessary.

### B. Plaintiff's Motion for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *O'Neal v. City of Chicago,* 392 F.3d 909, 910 (7th Cir.2004). In ruling on a motion for summary judgment, the court must resolve all factual disputes and draw all inferences in the light most favorable to the non-moving party. *Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469, 480 (7th Cir.2002).

The parties agree that the stock repurchase agreement required defendant to repurchase plaintiff's stock at fair market value when he terminated his employment. They disagree about what, if anything, the agreement required them to do when the fair market value of the stock was disputed. According to plaintiff, defendant was required to follow the procedures outlined in section 5(b) of the agreement and either accept plaintiff's proposed purchase price or select an outside appraiser. Because it did not do so within 30 days, plaintiff argues, defendant must now pay him the repurchase price he proposed. Defendant contends that section 5(b) does not apply to situations, such as this one, where a shareholder has voluntarily terminated his employment.

1. *Applicability of section 5(b)*

 Under Wisconsin rules of contract interpretation, courts must give effect to each of an agreement's provisions. *Kurt Van Engel Com'n Co., Inc. v. Zingale*, 2005 WI App 82, ¶ 45, 280 Wis.2d 777, 696 N.W.2d 280 (citing *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis.2d 349, 366, 377 N.W.2d 593, 602 (1985) ("agreement should be given a reasonable meaning so that no part of the contract is surplusage")). The stock repurchase agreement is divided into sections discussing the different conditions under which defendant will repurchase stock from a shareholder. Section 5 describes the repurchase process to be followed upon the death of a shareholder. Section 5(b) requires the company to pay fair market value of a shareholder's stocks to the shareholder's estate if the shareholder dies three or more years after the repurchase agreement has been signed. If either the company or the representative of the shareholder's estate contests the fair market value proposed by the opposing party, either party can interrupt negotiations by providing written notice of a proposed purchase price for the stock. Within 30 days of receiving the notice, the opposing party may either accept the proposed price or demand an appraisal conducted by an appraiser agreed upon by both parties. If an appraiser is selected, her assessment of the fair market value of the stock is binding.

The dispute resolution process outlined in section 5(b) is applicable also to stock repurchases that follow the disability of a shareholder. Section 8 requires the company to repurchase a disabled shareholder's stock "at the purchase price and under the terms and conditions of section 5, substituting the date of disability for the date of death." The procedure outlined in section 5 is not referred to explicitly in section 7, which governs repurchase of stock upon termination of a shareholder's employment. Section 7 imposes on defendant a duty to purchase stock from a former employee at "fair market value" but does not indicate how disputes regarding fair market value are to be resolved.

Plaintiff contends that the discussion of fair market value provided in section 5(b) applies unambiguously to the entire agreement. The last sentence of the first paragraph of section 5(b) states, "for purposes of this agreement, 'fair market value' shall be determined pursuant to good faith negotiations between the parties to the purchase and sale." The parties agree that the clause "for purposes of this agreement," indicates that the sentence applies to the entire agreement.

Plaintiff argues that the provisions for dispute resolution found in paragraph 5(b) also apply to the entire agreement under the "last antecedent rule." His argument is grounded upon the following text from section 5(b):

> ... For purposes of this agreement, 'fair market value' shall be determined pursuant to good faith negotiations between the parties to the purchase and sale.
>
> At any time during *this negotiation process*, either party to the purchase and sale may give written notice to the other party indicating the purchase price per share that such a party is willing to apply to the purchase and sale ("the proposed purchase price per share") ...

(Emphasis added) Under the last antecedent rule, relative and qualifying phrases are to be applied to the immediately preceding words or phrases. *Peterson v. Sinclair Refining Co.*, 20 Wis.2d 576, 588–89, 123 N.W.2d 479, 486 (1963). Therefore, the phrase "this negotiation process" refers to the "good faith negotiations" referred to in the preceding sentence. Be-

cause the parties agree that "good faith negotiations" must be undertaken with respect to all stock repurchases referred to in the agreement, the methods for resolving that "negotiation process" outlined in the subsequent paragraph must apply to all stock repurchases, including those made under section 7.

Defendant contends that the contract is ambiguous at best. It argues that there would be no need for section 8 of the agreement to explicitly adopt the "terms and conditions of section 5" if section 5 applied unambiguously to all disputes. However, by adopting "the terms and conditions" of section 5, section 8 guarantees not only that the procedures for dispute resolution will be applicable, but guarantees also that the payout procedures of section 5 will apply to stock purchases made under section 8. Section 5 provides for a one-time cash payment to the shareholder's estate made within 60 days of the a shareholder's death. By incorporating the "terms and conditions" of section 5, section 8 guarantees a one-time cash payment to the representative of a disabled shareholder. On the other hand, section 7 does not adopt *all* of the terms and conditions of section 5. Instead, it provides for a one-time cash payment within 30 days for all stock purchases valued under $50,000 and an optional five year financing for purchases exceeding $50,000. Therefore, the explicit reference to section 5 found in section 8 serves a purpose beyond resolving disputes over the fair market value of stock.

Courts may not depart from the plain meaning of a contract when it is free of ambiguity. *United Farm Agency, Inc. v. Klasen,* 112 Wis.2d 634, 641, 334 N.W.2d 110, 113 (1983); *Dykstra v. Arthur G. McKee & Co.,* 92 Wis.2d 17, 38, 284 N.W.2d 692, 702–703 (Ct.App.1979). Although the drafters placed the terms for resolving disputes over fair market value in the section labeled "death of a shareholder," the terms of the agreement are not limited by headings. The language of the agreement indicates that the provisions of section 5(b) apply to disputes arising any time the parties fail to agree on the fair market value of the stock to be purchased. Therefore, I will grant plaintiff's motion for summary judgment as to the applicability of the provisions of section 5(b) to the purchase of his stock.

### 2. *Remedy*

■ Plaintiff contends that he complied with the terms of section 5(b) by sending defendant a letter on April 1, 2005, proposing that defendant either accept his proposed $6.2 million purchase price or select an appraiser. Defendant did not select an appraiser within 30 days, an omission that plaintiff contends was a *de facto* acceptance of plaintiff's proposed purchase price. Defendant contends that it provided the first "written notice" of a proposed purchase price when it presented plaintiff with its "fair market value calculation" on March 3, 2005. This argument does not assist defendant, however, because plaintiff responded by letter within 30 days, rejecting defendant's proposed price, proposing his own price and proposing an appraiser. The appraisal never occurred, presumably because the parties were engaged in sporadic attempts to resolve their dispute.

The parties' confusion over who gave notice first is understandable, given the language of section 5(b). On one hand, section 5(b) imposes upon the parties a duty to negotiate in good faith, a process which necessarily requires the parties to exchange proposed purchase prices. On the other hand, the dispute resolution procedures are triggered "at any time during the negotiation process" when one side

provides notice to the other side of a proposed purchase price. In his April 18, 2005 letter to defendant's attorney, plaintiff's attorney suggested that the 30–day time limit was triggered by plaintiff's March 21, 2005 letter. He asked, however, that the time limit be waived for 30 days. Now, plaintiff contends that its April 1, 2005 letter began the 30–day time limit for selecting an appraiser. Because the parties continued to negotiate until at least April 29, 2005, it is unclear whether the provisions of section 5(b) were properly invoked prior to that time. On May 13, 2005, plaintiff once again proposed his purchase price and asked defendant to either accept his proposal or designate an appraiser. On May 27, 2005, less than thirty days later, plaintiff filed this lawsuit.

█ Under the circumstances, it would be wholly unjust to award plaintiff the $6.2 million he requests. His figure is not the result of an appraisal or other expert opinion; it was derived from a press release about the value of an unrelated company. Furthermore, it is unclear when, if ever, defendants "defaulted" under section 5(b), since the parties engaged in sporadic negotiations until the end of April. However, plaintiff has asked for alternative relief in the form of specific performance. Specific performance is an equitable remedy that rests in the discretion of the court. *Edlin v. Soderstrom*, 83 Wis.2d 58, 70, 264 N.W.2d 275 (1978). Although "ordinarily a party will not be compelled to specifically perform a contract for the sale of shares of corporate stock ... if the shares cannot be readily secured in the market specific performance is allowed." *Kurth v. Hauser*, 262 Wis. 325, 327, 55 N.W.2d 367, 368 (1952). If the granting of equitable relief can be framed in such a way as to avoid injustice to the defendant, specific performance should be decreed. *Fontaine v. Brown County Motors Co.*, 251 Wis. 433,

439, 29 N.W.2d 744, 747–48 (1947). In this case, specific performance would be fair to both parties, as it would permit them to begin the process of resolving their dispute with a correct understanding of the operative provisions of section 5(b).

I note that, while asking the court to order defendant "to comply with the terms of the agreement" as set forth in section 5(b), plaintiff requests an order that conflicts with those terms. He asks the court to order (1) an appraisal conducted by an appraiser of his choice and (2) payment in full of the appraisal costs and stock purchase price within thirty days of this court's order. The procedure described in section 5(b) requires the parties to agree upon an appraiser. In addition, under the operative provisions of section 7, defendant has the option of paying the price in full at closing or paying 10% of the purchase price in cash at closing with the balance paid annually over five years at 8% interest. I will grant plaintiff's motion and order defendant to comply with the procedures set forth in section 5(b) and *only* with those procedures. Under those procedures, defendant has thirty days within which to select an appraiser or consent to plaintiff's proposed purchase price. Once an appraiser is selected, her determination of the fair market value of plaintiff's shares will be binding on the parties. Payment of the purchase price shall be made according to the provisions of section 7 of the agreement.

## ORDER

IT IS ORDERED that:

1. Defendant Charter Films, Inc.'s motion to dismiss plaintiff's motion for summary judgment is DENIED;

2. Plaintiff's motion for summary judgment is GRANTED. Defendant is ordered to comply with the provisions of

section 5(b) of the parties' stock repurchase agreement