REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 923

September Term, 2013

GRIFFITH ENERGY SERVICES, INC.

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, et al

Eyler, Deborah S.,
Leahy,
Moylan, Charles E., Jr.
        (Retired, Specially Assigned),

                                JJ.

Opinion by Eyler, Deborah S., J.

Filed: August 25, 2015

In this insurance coverage case, Griffith Energy Services, Inc. ("Griffith"), the appellant, challenges a declaratory judgment entered by the Circuit Court for Howard County in favor of New Hampshire Insurance Company ("New Hampshire") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "the Insurers"), the appellees. Griffith had sought a ruling that a business automobile liability policy issued by New Hampshire ("the Auto Policy") and a business comprehensive general liability insurance policy issued by National Union ("the CGL Policy") both covered property damage that resulted from a mis-delivery of home heating oil by a Griffith fuel truck driver.

The circuit court disagreed. On summary judgment, it ruled that the Auto Policy provided coverage, but that its liability policy limit was exhausted; that the CGL Policy did not provide liability coverage; and that Griffith was not entitled to additional costs of defense.

## FACTS AND PROCEEDINGS

### A. The Incident.

Griffith is in the home heating oil business. On August 24, 2010, one of its fuel truck drivers was scheduled to make a delivery to 1129 Colonial Avenue, in Alexandria, Virginia. By mistake, he drove to 1135 Colonial Avenue ("1135"). 1135 is the center house of three connected houses, *i.e.*, a "triplex." The houses are 17 feet wide and share one roof. The addresses for the other houses in the triplex are 1137 Colonial Avenue ("1137"), and 1133 Colonial Avenue ("1133").

At 1:08 p.m., the driver attached the truck's fuel dispensing hose to an exterior uncapped fill port extruding from the rear basement wall of 1135. He proceeded to pump about 330 gallons of fuel oil into the fill port. He had been pumping for slightly over 8 minutes when Katherine Turner, who rented 1135, rushed outside and told him that oil was pouring into the finished basement. (1135 had been converted from oil heat, and the fuel oil tank had been removed.)

The driver immediately realized that he was at the wrong address and stopped pumping. He contacted his dispatcher, who in turn notified John Hall, a Griffith claims specialist, who arrived within an hour. The driver remained on the scene and was there when Hall arrived. The driver left the premises between 2:30 and 3:00 p.m.

Hall entered 1135 through the front door and smelled heating oil. The carpet in the finished area of the basement was saturated with oil, and there was oil on the floor in the finished bathroom. Hall noticed an exposed floor drain at the rear of the basement, in the utility area, and observed that oil had flowed down it.

The Alexandria Fire Department ("AFD") responded, also within an hour of the incident, and AFD personnel conducted atmospheric monitoring tests in all three houses. The tests revealed "trace readings displaying on the lower explosive limit" in the basement of 1135. The other houses were "clear for flammability readings." AFD personnel determined it was likely that much of the heating oil had gone down the basement drain in 1135. They could not tell at that point whether the drain was connected to municipal lines

2

or simply emptied below the basement's concrete slab. (The latter subsequently was determined to be the case.) The AFD Fire Marshall condemned 1135 and shut off the utilities to all three houses.

Hall contacted Miller Environmental, Inc. ("MEI"), an environmental management firm, and representatives of that company arrived at the scene within a few hours of the incident. They laid down sorbent material in the basement of 1135 to soak up free-standing oil. Around 5:30 p.m., Timothy Trayers, the owner of 1137, arrived home and reported finding oil in his sump. The sump was in the rear corner of his basement, near the common wall with 1135 and adjacent to the area in which the fill port emptied. Hall and others entered the basement of 1137 and found the oil in the sump. No other oil was visible in 1137 at that time. Approximately 25 gallons of heating oil was pumped out of the sump that evening. The basement of 1133 was inspected as well. It did not have a sump, and there was no oil then visible. MEI set up air scrubbers in 1137 and 1133.

Charles and Christine Perham owned 1135 and rented it to Turner, who lived there with her son. As noted, 1137 was owned by Trayers; he lived there with his fiancee. Jim and Pam McVeigh owned and lived in 1133. The residents of all three houses stayed in hotels on August 24, 2010, and then were relocated to long-term housing, at Griffith's expense.

In accordance with Virginia law, Griffith notified the Virginia Department of Environmental Quality ("VDEQ") about the incident. State and city laws required Griffith to clean the soil at the properties to reach a concentration of oil at or below 100 parts per

3

million ("ppm"). The day after the incident, MEI tested the houses for volatile organic compounds ("VOCs"). The tests revealed VOC levels sufficiently elevated to render all three houses uninhabitable.

Based on oil having been found in the sump of 1137, and the water table in the area being high, MEI concluded that the oil that the driver pumped into 1135 "most probably ha[d] gone under the [basement] slabs of all three residences." The slabs, which are the concrete basement floors of the houses, sit on a 14-inch layer of river stone, under which is native soil. The interior common walls of the houses are made of solid concrete block, and their footers extend to the native soil. The exterior walls of the triplex are brick and rest on hollow concrete block foundation walls, which extend below ground and are set on concrete footers, which also rest on native soil.

On August 26, 2010, the basements of the houses were prepared for "subslab assessment." All salvageable personal belongings were removed from the houses and the interior common walls between the basements were demolished. In the following days, the basement slabs were broken apart and removed down to the concrete footers. The river stone underlying the slabs was removed to the level of the soil. Multiple soil samples were taken at this depth and the bottom of the footers to determine the extent of the oil saturation and its migration in the soil. Samples also were taken from the hollow block walls above the footers. The soil around the perimeter of the triplex was probed for sampling, and monitoring wells were installed.

4

Analysis of the data obtained from these samples and wells revealed that the oil had "remain[ed] in the footprint of the three houses and ha[d] not gone past the house exterior walls." On September 7, 2010, 1137 was condemned, and on September 22, 2010, 1133 was condemned.

As part of its remediation plan, Griffith first proposed demolishing, excavating, and replacing the houses. Subsequent clean-up and analysis of the site enabled Griffith to rehabilitate and restore the houses instead.

## B. The Insurance Policies.

At the time of the incident, Griffith was a Named Insured on the Auto Policy and on the CGL Policy.[1] The policies were owned by Central Hudson Enterprises Corporation ("CHEC"). The Insurers are Pennsylvania companies with their principal places of business in New York City, and are licensed to transact business in Maryland. They are owned by Chartis USA, Inc. ("Chartis"), a member of the American International Group, Inc. ("AIG"). The policies were underwritten at the same time by the same underwriter, John Springer. Chartis Claims, Inc., is the claims administrator for the policies.

Also at the relevant time, Griffith was a Named Insured on an Excess Policy sold by Associated Electric & Gas Insurance Service Limited ("AEGIS") to CHEC.

### 1. Auto Policy

*Indemnity*

---

[1] The effective dates for both policies were December 31, 2009, to December 31, 2010.

5

The policy afforded Griffith $1,000,000 in liability coverage, as follows:

> We will pay all sums an "insured" legally must pay as damages because of . . . "property damage" to which this insurance applies, caused by an "accident" and resulting from the . . . . use of a covered "auto."
>
> We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the. . . . use of covered "autos." However, we will only pay for the "covered pollution cost or expense" if there is . . . "property damage" to which this insurance applies that is caused by the same "accident."

Auto Policy, Section II. A.[2] The fuel truck was a "covered 'auto.'"

An "'[a]ccident' includes continuous or repeated exposure to the same conditions resulting in . . . 'property damage.'" Auto Policy, Section V. A. "Property damage" is "damage to or loss of use of tangible property." Auto Policy, Section V. M. "'Covered pollution cost or expense'" is

> any cost or expense arising out of:
>
> > 1. Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of "pollutants"; or
> >
> > 2. Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing,

---

[2]The coverage includes "bodily injury" as well. Turner, the tenant leasing 1135, made a claim for bodily injury occurring during the mis-delivery. The McVeighs, the owners of 1133, alleged that they suffered emotional distress as a result of the mis-delivery. The issues in this case only concern property damage, however, so we will not make reference to the bodily injury provisions, unless necessary.

containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "pollutants."

Auto Policy, Section V. D. Fuel oil is a "pollutant."[3] "All . . . 'property damage' and 'covered pollution cost or expense' resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one 'accident.'" Auto Policy, Section II. C.

The Auto Policy contains an exclusion for "Completed Operations." Under that exclusion, there is no liability coverage for "'property damage' arising out of [the insured's] work *after that work has been completed or abandoned*." Auto Policy, Section II. B. 10. (Emphasis added.) "Work" means work or operations performed by the insured or on its behalf and includes "materials, parts or equipment furnished in connection with" the work. "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." *Id*.

The Auto Policy also contains a "Wrong Delivery of Liquid Products" endorsement, which operates as an exclusion. It provides:

> This insurance does not apply to . . . "property damage" resulting from the delivery of any liquid into the wrong receptacle or to the wrong address . . . if the . . . "property damage" occurs *after delivery has been completed*.
>
> Delivery is considered completed even if further service or maintenance work, or correction, repair or replacement is required because of wrong delivery.

---

[3] "Pollutants" are "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot fumes, acids, alkalis, chemicals and waste. . . ." Auto Policy, Section V. L.

(Emphasis added.)

### *Other Policies Provision*

The $1,000,000 liability coverage limit applies "[r]egardless of the number of . . . claims made" respecting an "accident." Auto Policy, Section II. C. "[T]he most [New Hampshire] will pay for the total of all damages and 'covered pollution cost or expense' combined, resulting from any one 'accident'" is the $1,000,000 limit. *Id.*

The Auto Policy includes the following anti-stacking condition:

**Two Or More Coverage Forms Or Policies Issued By Us**
If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident," the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

Auto Policy, Section IV. A. 8.

### *Duty to Defend*

The Auto Policy's cost of defense provision is as follows:

We have the right and duty to defend any "insured" against a "suit" asking for [damages to which the policy applies] or a "covered pollution cost or expense." However, we have no duty to defend any "insured" against a "suit" seeking damages for . . . "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

8

Auto Policy, Section II. A.  A "suit" is "a civil proceeding in which . . . [d]amages because of . . . 'property damage'; or a 'covered pollution cost or expense' to which [the Auto Policy] applies, are alleged."  Auto Policy, Section V. N.   A "suit" includes an arbitration proceeding to which the insured must submit or submits with New Hampshire's consent, or "[a]ny other alternative dispute resolution proceeding in which such damages or 'covered pollution costs or expenses' are claimed and to which the insured submits with [New Hampshire's] consent."  *Id.*

### 2. CGL Policy

*Indemnity*

The CGL Policy afforded Griffith $1,000,000 in liability coverage per "occurrence" with a $2,000,000 aggregate limit.  It states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.
>
> * * * *
>
> This insurance applies to . . . "property damage" only if: (1) the . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory". . . .

CGL Policy, Section I. 1. a and b.  An "[o]ccurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  CGL Policy, Section V.13.  "Property damage" is:

> a. Physical injury to tangible property, including resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

9

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

CGL Policy, Section V. 17.

As pertinent, exclusion g to the CGL Policy provides that there is no liability coverage for property damage "arising out of" the "use" of an "auto . . . owned or operated by" an insured. CGL Policy, Section I. 2. g.[4] "Use includes operation and 'loading and unloading.'" *Id*. Unloading "means the handling of property . . . [w]hile it is being moved from an . . . 'auto' to the place where it is finally delivered." CGL Policy, Section V. 11. c.

The CGL Policy includes an endorsement for "Misdelivery of Liquid Products Coverage," which modifies exclusion g:

Exclusion g . . . does not apply to . . . "property damage" arising out of: . . . [t]he delivery of any liquid product into a wrong receptacle or to a wrong address. . . *if the . . . "property damage" occurs after such operations have been completed or abandoned at the site of such delivery.*

Operations which may require further service, maintenance, correction, repair or replacement of performance at the wrong address or because of any error, defect or deficiency, but which are otherwise completed, will be deemed completed.

(Emphasis added.)

***Other Insurance Condition***

An "Other Insurance" condition to the CGL Policy states, as relevant:

If other valid and collectible insurance is available to the insured for a loss we cover under [the liability coverages], our obligations are limited as follows:

---

[4]There is no dispute that Griffith's delivery truck was an "auto" within the meaning of this provision.

10

a.  Primary Insurance
This insurance is primary except when Paragraph b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance
(1) This insurance is excess over:
(a) Any of the other insurance, whether primary, excess, contingent or on any other basis: . . . . (iv) If the loss arises out of the. . use of . . .  "autos". . . .to the extent not subject to Exclusion g . . . .

CGL Policy, Section IV. 4. a. and b.

***Duty to Defend***

The CGL Policy states, as pertinent:

We will have the right and duty to defend the insured against any "suit" seeking . . . .damages [covered by the policy].  However, we will have no duty to defend the insured against any "suit" seeking damages for . . ."property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But: . . . [o]ur right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B. . . .

CGL Policy, Section I. 1. a.  The definition of "suit" is the same as the definition in the Auto Policy.  A "suit" is "a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are alleged."  CGL Policy, Section V. 18.  "Suit" includes an arbitration proceeding to which the insured must submit or submits with National Union's consent, or "[a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with [National Union's] consent."  *Id.*

11

## 3. Excess Policy

Griffith was a Named Insured on the AEGIS Excess Liability Insurance Policy, which was in effect from June 1, 2010, to June 1, 2011. It afforded Griffith excess liability coverage for each occurrence. Condition (E) of the Excess Policy states:

> [AEGIS] shall not be called upon to assume charge of the settlement or defense of any CLAIM made against the INSURED, but [AEGIS] shall have the right and shall be given the opportunity to associate with the INSURED, or the INSURED's underlying insurer(s), or both, in the defense and control of any CLAIM where the CLAIM involves or may involve [AEGIS] in which event the INSURED and [AEGIS] shall cooperate in all things in the defense of such CLAIM.

## C. Coverage Determinations by the Insurers.

On August 25, 2010, the day after the incident, Griffith submitted an "Automobile Loss Notice" to Chartis Claims, Inc., the claims administrator for both policies, making a claim under the Auto Policy. On September 1, 2010, a claims adjuster informed Griffith that due to the "Wrong Delivery of Liquid Products" endorsement (which, as noted, operates as an exclusion), the Auto Policy did not cover the loss. The adjuster told Griffith that the loss was covered by the CGL Policy, however.

On September 20, 2010, with Griffith's approval, its insurance broker e-mailed the claims adjuster, challenging the denial of coverage under the Auto Policy. He argued that, because the driver had discovered his mistake while the fuel oil delivery was in progress, and had not left the site when he notified the Griffith dispatcher of the mistake, the delivery was

12

not completed and therefore the "Wrong Delivery of Liquid Products" endorsement did not apply.

On October 6, 2010, David Baskind, another Chartis Claims adjuster, responded with a "Withdrawal of Disclaimer of Coverage" letter agreeing that the "Wrong Delivery of Liquid Products" endorsement did not apply, and therefore the mis-delivery was covered under the Auto Policy. The letter reserved all rights of National Union (although it appears that it intended to reserve all rights of New Hampshire, as the Auto Policy carrier). The next day, Baskind wrote a "Disclaimer of Coverage" letter to Griffith stating that, based on exclusion g, there was no coverage under the CGL Policy; and the endorsement for "Misdelivery of Liquid Products," which, as explained, is an exception to exclusion g, did not apply because "delivery was not completed" when the "property damage commenced."

About $80,000 had been paid under the CGL Policy before the October 7, 2010 disclaimer of coverage. Those payments were transferred to the Auto Policy. During the following year, the payments mounted for remediation and restoration of the properties and for lodging and living expenses for the affected residents.

On September 22, 2011, AEGIS, aware that the $1,000,000 liability coverage limit for the Auto Policy was nearing exhaustion, wrote to Griffith, reminding it that its policy was excess. In so doing, it stated that any indemnity obligation under the Excess Policy only would arise after the Auto Policy liability limit was exhausted *and after the CGL Policy*

13

***liability limit was exhausted***.  In its letter, AEGIS took the position that Chartis incorrectly

had disclaimed coverage under the CGL Policy:

> [T]he Misdelivery of Liquid Products Coverage endorsement [in the CGL
> Policy] restores coverage where "the 'bodily injury' or 'property damage'
> *occurs after such operations have been completed . . . ."*
>
> Based on the facts as AEGIS understands them, it appears that *all of the bodily*
> *injury and most of the property damage that allegedly resulted from the*
> *heating oil release took place after the heating oil delivery had been*
> *completed.*[5] . . .  Further, AEGIS understands that the heating oil that was
> pumped into the center unit [1135] did not immediately spread to the
> neighboring homes. Thus, it appears that Chartis's disclaimer of coverage
> under the [C]GL Policy is improper.
>
> Consequently, it appears that Chartis wrongfully disclaimed [coverage under
> the CGL Policy] and that the $1 million limit of liability in that policy should
> also be available to Griffith for these claims.  Further, that policy would also
> provide for Griffith's defense.  If so, Chartis would not be close to exhausting
> its obligations under its policies to Griffith.

(Emphasis in original.)

By October 11, 2011, New Hampshire had made payments under the Auto Policy

totaling $999,999.47.  It also had paid $81,856.35 in attorneys fees and costs for counsel

representing Griffith.  The attorney was a member of  Chartis's approved panel of counsel

that it used regularly.  That day, Baskind sent Griffith a letter stating that "as a result of the

payments processed today, the indemnity limit under [the Auto Policy] . . . has been

exhausted."

---

[5]Again, the only personal injury claims were made by the tenant of 1135 and the
owners of 1133, the McVeighs.  Griffith did not pay any monies in settlement of the
McVeighs' emotional distress claim, however, and that claim is not at issue in the instant
appeal.

14

**D. Claims by Residents and Declaratory Judgment Action.**

Before the October 2011 letters to Griffith from Chartis and AEGIS, the three homeowners and the tenant of 1135 made claims against Griffith arising out of the incident, including for loss of use of the houses ("the underlying claims"). Griffith had kept Chartis apprised of developments regarding the underlying claims before and after Chartis advised it that the liability policy limit of the Auto Policy had been exhausted.

Griffith filed a declaratory judgment action (this case) against the Insurers on April 18, 2012. It alleged that National Union wrongfully had disclaimed coverage under the CGL Policy. It maintained that the CGL Policy was triggered once the policy limits under the Auto Policy were reached. Moreover, it alleged, New Hampshire incorrectly had determined that its liability limit under the Auto Policy had been exhausted, by counting investigation costs against the policy limit for indemnity, instead of separately paying those as a cost of defense; and that it had wrongfully refused to pay the cost of defense of the underlying claims.

Soon after filing suit, Griffith negotiated settlements of the underlying claims. On April 30, 2012, it entered into a written settlement agreement with Turner for $50,000 for property damage and personal injury. On June 25, 2012, it entered into written settlement agreements with the owners of 1133, 1135, and 1137, in which it agreed to purchase their properties and resolve all claims related to the incident for $850,000 each, plus an additional $50,600 for rental expenses incurred by the McVeighs. The settlement amounts paid by

15

Griffith thus totaled more than $2.6 million. No lawsuits were filed by any of the claimants before the settlements were reached.

Griffith and the Insurers engaged in discovery and then filed cross-motions for summary judgment. On June 17, 2013, the court held a hearing on the motions, and granted summary judgment in favor of the Insurers.

In ruling from the bench, the court explained that "the insurance policies were issued for different situations." The Auto Policy "was designed to cover those losses that would occur during the use of an automobile in the . . . conducting of the Insured's business[,]" which would include Griffith's driver using the fuel truck to deliver home heating oil. Also, the Auto Policy covers specific types of losses resulting from accidents, and an accident, as defined in the policy, includes continuous or repeated exposure to the same conditions. The court concluded that the event that caused the damages to all three houses was one accident that was covered by the Auto Policy.

The court found that the CGL Policy "covers all other types of losses" that are not covered by the Auto Policy, and the losses in this case were not covered by the CGL Policy. It noted that all the property damage was caused by the mis-delivery of heating oil, and that "the delivery [n]ever really ended in this case, because the disaster was discovered during the course of it; and it was never abandoned . . . it was dealt with." The court concluded that, because there was no coverage under the CGL Policy, there was no excess coverage under

16

the "Other Insurance" provision of that policy, and therefore the CGL Policy did not come into play when the liability coverage limit of the Auto Policy was exhausted.

The court determined that coverage under the Auto Policy was limited to $1,000,000 per accident, and that that limit could be reached by payment of "covered pollution costs" and settlements or judgments, or any combination of those. It found that there need not have been a formal demand on the part of a government authority or agency for pollution clean up for New Hampshire to be required to pay "covered pollution costs and expenses" incurred, so long as those pollution costs and expenses were mandated by law. The court concluded that, given the amount of payments that had been made under the Auto Policy for covered pollution costs and expenses, as of October 11, 2011, the liability limit on that policy in fact had been exhausted.

Finally, the court interpreted the Auto Policy to mean that the duty to defend only would be triggered by the filing of a lawsuit against the insured or the involvement of the insured in a proceeding before a neutral arbiter. Neither happened; instead, Griffith made the unilateral decision to "engage counsel, investigate the matter, and []enter into direct settlement negotiations with the affected homeowners" and did so notwithstanding that there had been no refusal by New Hampshire to investigate or settle. Thus, New Hampshire's duty to defend under the Auto Policy never was triggered, and it did not owe Griffith any defense costs.

The same day as the hearing, the court issued a written order granting summary judgment in favor of the Insurers and against Griffith "for the reasons stated by the Court during the hearing." The court did not issue a written opinion.

Griffith noted a timely appeal, presenting three questions for review, which we have rephrased:

I.    Did the circuit court err by not issuing a written opinion?

II.   Did the circuit court err by ruling that there was no liability coverage under the CGL policy and the liability coverage limit of the Auto Policy had been exhausted?

III.  Did the circuit court err by ruling that Griffith was not owed a duty to defend under the Auto Policy?

For the following reasons, we answer the first question in the affirmative and shall order that the defect in the judgment be corrected on remand. We answer the second question in the negative and conclude that the third question is rendered moot by our resolution of the second question.

## DISCUSSION

### I.

### Declaratory Judgment

Griffith contends the trial court erroneously "failed to issue a written opinion declaring the rights and obligations of the parties" as required by the Maryland Uniform Declaratory Judgment Act ("MUDJA"), Md. Code (1973, 2013 Repl. Vol.), section 3-401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"). The Insurers respond that the

18

trial court's order was not deficient because it referenced and incorporated the court's oral ruling.

As discussed, the court ruled from the bench at the June 17, 2013 hearing on the motions for summary judgment and, that same day, issued its written judgment granting summary judgment in favor of the Insurers "for the reasons stated by the Court during the hearing."[6]

> The Court of Appeals has made clear on numerous occasions that
>
> "when a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment and *that judgment*, defining the rights and obligations of the parties or the status of the thing in controversy, *must be in writing. It is not permissible for the court to issue an oral declaration. . . . When entering a declaratory judgment, the court must, in a separate document, state in writing its declaration of the rights of the parties. . . .*"

*Bowen v. City of Annapolis*, 402 Md. 587, 608-09 (2007) (quoting *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md, 106, 117 n.1 (2001) (first emphasis in *Allstate*, second emphasis in *Bowen*); *see also Union United Methodist Church, Inc. v. Burton*, 404 Md. 542 (2008).

---

[6]The Insurers state in their brief that the "text of the ruling . . . was in writing because the court's order incorporated the written hearing transcript." The record does not bear out this assertion. The transcript was not filed with the circuit court until July 17, 2013, a full month after the court entered its order granting summary judgment in favor of the Insurers. It was not attached, approved, or incorporated into the court's June 17, 2013 judgment. *See Union United Methodist Church, Inc. v. Burton*, 404 Md. 542, 551-52 (2008) (suggesting, but not deciding, that a written judgment expressly incorporating an attached transcript of an oral ruling declaring the rights of the parties that has been signed or otherwise approved by the trial court might satisfy the MUDJA).

'"The failure to enter a proper declaratory judgment is not a jurisdictional defect, however"' and an appellate court, '"in its discretion, may review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court."' *Bontempo v. Lare*, __ Md. ___, Slip Op., No. 55, Sept. Term 2014 at *38 (filed Aug. 6, 2015) (quoting *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256 (2009)); *see also Point's Reach Condo. Council of Unit Owners v. The Point Homeowners Ass'n, Inc.*, 213 Md. App. 222, 283 (2013) (where "there is no assertion by either party on appeal that the transcript of the court's oral ruling does not accurately reflect the ruling that was made or that there is any misunderstanding about the nature of the court's decision, as embodied in its oral ruling," we may reach the issues raised on appeal and direct that the defect in the judgment be corrected by amendment upon remand to the circuit court). We exercise our discretion to review the merits of the instant appeal and shall direct the court to correct the defect in the judgment on remand.

## II.

### Indemnity

The parties agree that the Auto Policy provided liability coverage for the property damage to 1135. They disagree over which policy provided liability coverage for the property damage to 1133 and 1137. Griffith contends the property damage to 1133 and 1137 was covered by the CGL Policy, and the circuit court erred in ruling to the contrary. The Insurers contend the Auto Policy provided liability coverage for property damage to all three

20

houses, and the circuit court correctly ruled that the CGL Policy did not provide any such coverage.

Griffith's argument, which focuses on the timing of the property damage sustained to each house, is as follows. The Auto Policy covers property damage caused by an accident involving the use of a covered auto, here, the fuel truck. When the auto is being used for work, the policy excludes coverage for 1) property damage arising after the work has been completed or abandoned; and, even more specifically, 2) property damage resulting from the delivery of liquid product to the wrong address if the property damage "occurs after delivery has been completed." The damage to 1135 was sustained before the work and delivery were completed, *i.e.*, before the driver stopped pumping the oil from the truck, and therefore is covered by the Auto Policy. Griffith maintains that the damage to 1133 and 1137 was sustained *after* completion of the work/delivery, however, and therefore is not covered by the Auto Policy.

Griffith further asserts that, although ordinarily the CGL Policy does not cover property damage resulting from any accident involving the use of an auto (exclusion g), it does cover property damage resulting from the use of an auto when the accident was a mis-delivery of a liquid product by an auto and the property damage occurred after the mis-delivery was completed or abandoned (Misdelivery of Liquid Products Endorsement). Griffith maintains that the property damage to 1133 and 1137 did not happen when the mis-delivery was taking place. Rather, it happened after the mis-delivery was completed or

21

abandoned, *i.e.*, after the driver stopped pumping the oil, when the oil pumped into 1135 spread and seeped into 1133 and 1137. Therefore, the property damage to 1133 and 1137 is covered by the CGL Policy.

Relatedly, Griffith argues that because the property damage to 1133 and 1137 is covered by the CGL Policy, the payments made under the Auto Policy for those properties should have been made under the CGL Policy. Therefore, the liability limit of the Auto Policy was not exhausted, and the circuit court erred in ruling that it was.

The Insurers' argument focuses on the nature and timing of the accident. They assert that the Auto Policy and the CGL Policy, issued as a package, cover two mutually exclusive mis-delivery of heating oil situations when the use of an auto is involved. In the first situation, which the Auto Policy covers, the property damage occurs during the mis-delivery. In the second situation, which the CGL Policy covers, the property damage occurs after the mis-delivery. They maintain that the triplex was a single structure that sustained damage during the mis-delivery. The seepage and spread of the mis-delivered oil from the center house in the structure to the end houses in the structure merely was a continuation of the property damage that occurred during the mis-delivery, not the happening of property damage after the mis-delivery ceased.

Thus, in the Insurers' view, the property damage to all three houses was "inseparably connected in time and place with the damage from the misdelivery occurring while the erroneous unloading was taking place[,]" and cannot be parsed out in time so as to trigger

22

coverage under the Auto Policy for 1135 and coverage under the CGL Policy for 1133 and 1137. The Insurers assert that a conclusion that the property damage all happened during the mis-delivery, not after, is consistent with the definition of "accident" in both policies as including "continuous or repeated exposure to the same conditions resulting in . . . property damage."

Finally, the Insurers argue that, even if parsing were possible or permissible, the undisputed facts showed that all three houses suffered property damage while the mis-delivery was taking place. There is evidence that fumes from the oil were present in 1133 and 1137 when the oil was being poured into 1135, and, moreover, the owners/residents suffered a loss of use of the houses immediately upon the mis-delivery of the heating oil.

Neither the Auto Policy nor the CGL Policy contains a choice of law provision. Under those circumstances, Maryland applies the rule of *lex loci contractus*, *i.e.*, the law where the contract was made. *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 462-63 (2011). When the contract is for insurance, the *lex loci contractus* "is the state in which the policy [was] delivered and the premiums [were] paid." *Id*. (internal quotations marks and citation omitted). In the instant case, the Auto Policy and the CGL Policy were delivered in New York, but the premiums were paid in Maryland. The parties are in agreement that Maryland law and New York law respecting the interpretation of insurance policies are the same in all material respects.

We are guided by the well-established principles governing the interpretation of insurance policies:

> In Maryland, . . . insurance polices are construed like other contracts. *See, e.g., North River Ins. Co. v. Mayor & City Council of Balto.*, 343 Md. 34, 680 A.2d 480 (1996). Unlike many other types of contracts, however, the construction of insurance policies is also governed by "a few well-established principles," *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985), that are similar to those used in interpreting a statute. *Travelers Ins. Co. v. Benton*, 278 Md. 542, 365 A.2d 1000 (1976). . . .
>
> The "first principle of construction of insurance policies in Maryland is to apply the terms of the contract," *Mutual Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130, 133 (1986), to determine the scope and limitations of its coverage. *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995). This principle serves to achieve the touchstone of policy construction-to ascertain and effectuate the intent of the parties to the agreement. *Aragona v. St. Paul Fire & Marine Ins. Co.*, 281 Md. 371, 375, 378 A.2d 1346, 1348-49 (1977). To divine properly the parties' intent, the policy is viewed as a whole, without emphasis being placed on particular provisions. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995). Moreover, whenever possible, each clause, sentence, or provision shall be given force and effect. *See Pacific Indem, supra.* The nature of the policy, its purpose, and the facts and circumstances surrounding the execution of the insurance agreement are also important considerations in determining the parties' intent. *Pacific Indem.*, 302 Md. at 388, 488 A.2d at 488. . . .
>
> When examining the language of the policy, an "ordinarily and usually accepted" meaning should by accorded to the text, *Aragona*, 281 Md. at 371, 378 A.2d 1346, unless there is evidence that the parties intended to employ the word "in a special or technical sense," *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989), or the contract provides a specific definition for the word. *See Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991). If the policy "language is unambiguous and plain as to its meaning, construction of the insurance contract is within the province of the courts." *Pacific Indem.*, 302 Md. at 389, 488 A.2d at 488. Language is unambiguous when it has only one meaning to a reasonably prudent layperson. *See Marks Rentals, Inc.*, 288 Md. at 433, 418 A.2d at 1190 ("an ambiguity does arise if, to a reasonably prudent layman, the language used is susceptible of more than one meaning").

24

*Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 95-97 (1997) (some citations omitted).

With these principles in mind, we turn to the language of the insurance policies. Coverage under the Auto Policy is triggered by an "accident" causing bodily injury or property damage and "resulting from the use of an auto." An "'accident' includes continuous or repeated exposure to the same conditions resulting in . . . property damage." The CGL Policy is triggered by "'bodily injury' or 'property damage' caused by an 'occurrence' that takes place in the 'coverage territory,'" but excludes coverage for property damage "arising out of" the "use" of an auto including the "'loading and unloading'" of an auto. An "occurrence" is an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Under the plain language of these provisions, coverage under the Auto Policy is triggered by an accident occurring during a delivery of heating oil unless otherwise excluded. In the instant case, coverage was triggered under the Auto Policy because the mistaken discharge of heating oil into the basement of 1135 was an accident resulting from the use of an auto–the delivery truck–that resulted in property damage. The CGL Policy was not triggered because exclusion g excludes coverage for property damage arising out of the use of an auto, including the "loading and unloading" of the auto. It is undisputed that the "unloading" of the heating oil was not complete at the time the property damage to 1135 commenced.

The property damage to 1133 and 1137 also was "caused by an 'accident' [that] resulted from the . . . use of a covered 'auto.'" The definition of an "accident" in the Auto Policy is expansive, including "continuous or repeated exposure to the same conditions resulting in . . . property damage." The majority of courts construing this language in insurance policies adopt a "cause" approach, "'by referring to the cause or causes of the damage [or injury] and not to the number of injuries or claims.'" *CSX Transp., Inc. v. Continental Ins. Co.,* 343 Md. 216, 233 (1996) (quoting *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379 (6th Cir.1984)); *see also*, *e.g.*, *Munroe v. Continental W. Ins. Co.*, 735 F.3d 783, 791-92 (8th Cir. 2013) (applying Missouri law and opining that "an insured's single act is considered the accident from which all claims flow") (citation omitted); *Banner v. Raisin Valley Inc*., 31 F.Supp. 2d 591, 592 (N.D. Ohio 1998) (applying Michigan and Ohio law and holding that the "continuous or repeated exposure" definition "contemplates multiple injuries resulting from a single cause"); *Mason v. Home Ins. Co. of Illinois*, 532 N.E.2d 526, 528 (Ill. App. 1988) (agreeing with the trial court's conclusion that "the heavier weight of judicial authority . . . determined the number of occurrences by examining the cause of the loss rather than the effect"); 9 *Couch on Insurance* § 126:31 (3d ed. 2015) (discussing the "cause" approach).

In the instant case, the act of the insured that caused the property damage was the erroneous pumping of heating oil into the basement of 1135. That pumping was accomplished by using a fuel hose attached to a fuel delivery truck, a covered auto. Once the

26

oil had been pumped into 1135, all three houses in the triplex were continuously exposed to the same conditions – oil seepage – and all of the resulting property damage was caused by that exposure. As the court found, there was no other "accident" that caused the damages. This analysis also holds true under exclusion g of the CGL Policy. The property damage arose from an accident during the unloading of an auto and was thus excluded from coverage by the CGL Policy.

Griffith argues, however, that although there was only one accident, the Completed Operations exclusion and/or the Wrong Delivery endorsement operate to exclude the property damage to 1133 and 1137 caused by that accident from the Auto Policy's coverage; and the Misdelivery endorsement in the CGL Policy operates to restore coverage excluded under exclusion g.

We begin with the Completed Operations exclusion in the Auto Policy. It excludes from coverage "'property damage' **arising out of** [the insured's] work after that work has been abandoned or completed." (Emphasis added.) "The words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like." *N. Assurance Co. of Am. v. EDP Floors, Inc.*, 311 Md. 217, 230 (1987); *see also Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299 (1998) (the phrase "arising out of" requires only "but for" causation). The property damage to 1133 and 1137 arose out of the insured's work (the pumping of heating oil) at a time when that work had not been abandoned or completed. It was during the active pumping of 330 gallons of

27

heating oil that the property damage to the triplex commenced.  All of the property damage to 1133 and 1137 originated from that accident, not a separate accident occurring at some later point after the delivery of heating oil was complete.  The Completed Operation exclusion does not apply under the facts of this case.

We now turn to the Wrong Delivery endorsement in the Auto Policy and the Misdelivery endorsement in the CGL Policy.  The "Wrong Delivery of Liquid Products" endorsement excludes coverage for  "'property damage' resulting from the delivery of any liquid . . .  into the wrong receptacle or to the wrong address. . . . *if the . . . 'property damage' occurs after delivery has been completed*."  (Emphasis added.)  Thus, the "Misdelivery" endorsement restores coverage otherwise excluded under exclusion g of the CGL Policy for "'property damage' arising out of: . . . [t]he delivery of any liquid product into a wrong receptacle or to a wrong address. . . . *if the . . . "property damage" occurs after such operations have been completed or abandoned at the site of such delivery.*"  (Emphasis added.)  These two endorsements operate in a complementary manner: if the Auto Policy provides coverage for property damage arising from a wrong delivery or mis-delivery of liquid products, the CGL Policy does not provide coverage, and vice versa.

Griffith relies on the language emphasized above to posit that it is the precise timing of the *occurrence* of property damage that controls whether the Auto Policy or the CGL Policy is triggered.  More specifically, in its view, the property damage must have occurred before Griffith's driver stopped pumping the oil into the basement of 1135 for the Auto

28

Policy to apply. Thus, if oil had not spread beyond the confines of 1135 as of that moment in time, the Auto Policy would exclude coverage for the damage to 1133 and 1137, and the CGL Policy would be triggered for that damage. We disagree that this construction is supported by the policy language.

Reading the Auto Policy and the CGL Policy as a whole, the reasonable interpretation of the Wrong Delivery and Misdelivery endorsements is that the Auto Policy covers property damage in those situations when an accident causing property damage occurs contemporaneous with the wrong delivery/mis-delivery and that the CGL Policy covers property damage in those situations when an accident causing property damage occurs after the delivery has been completed or abandoned. Thus, if Griffith's driver had erroneously pumped heating oil into a fill port at the wrong address, but one with an attached oil tank, and, hours, days, or weeks later, that oil leaked from the oil tank and caused an explosion, the CGL Policy, not the Auto Policy, would cover the property damage. This is so because at the time of the completion of the delivery, there would have been no property damage at all. In the instant case, the property damage commenced the moment Griffith's driver started pumping oil into the basement of 1135. The full extent of the property damage manifested itself over hours, days, and weeks, but it "occur[red]" when the oil was discharged into the basement, soaking into the floor and walls and escaping down the floor drain into the soil beneath the basement slabs. At that discrete point in time, the property damage to and loss of use of 1133 and 1137 were predestined. The heating oil seeping into the soil could not be

29

recaptured. Within hours, MEI predicted that the heating oil "most probably ha[d] gone under the [basement] slabs of all three residences." The subslab assessment conducted two days after the incident confirmed this prediction, showing that the heating oil had saturated the soil under 1133 and 1137.

This construction also is consistent with the definition of "occurrence" in the CGL Policy. An "occurrence" is an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Thus, property damage may "occur" when exposure to the "general harmful conditions" arises, even if the extent of the property damage manifests over time as a result of the continuous exposure to those conditions. Here, the exposure to heating oil, a harmful condition, occurred when it was pumped into the middle house in a triplex with no receptacle to contain it. *See Mohawk Valley Fuel Co. v. Home Indemnity*, 165 N.Y.S.2d 357, 361 (N.Y. Gen. Term 1957) (Fuel oil mistakenly pumped into a home without an oil tank was, once present, a "continuing agency for harm.").

The property damage here was a continuous seeping of oil from a point of origin in one house into a drain that emptied beneath a basement slab and the continued migration of that oil through the soil until it all had been absorbed. Property damage of this kind cannot be parsed out in time. The spread of the oil was inevitable and unstoppable once it was pumped. All of the property damage occurred during the wrong delivery of heating oil, which, in turn, was an accident resulting from the use of an auto.

30

The fact that the delivery was in progress when the mistaken discharge of heating oil was discovered also brings the property damage within the coverage of the Auto Policy. In *Peterson v. Sinclair Refining Co.*, 123 N.W.2d 479 (Wis. 1963), property damage arose after a delivery of the wrong type of liquid product. The Petersons ordered fuel oil and gasoline from Sinclair. The Sinclair delivery truck had four separate compartments, two containing fuel oil and two containing gasoline. The delivery person pumped the gasoline into a gasoline tank on the Peterson property. He then moved his truck and prepared to pump the fuel oil into an oil tank in the Petersons' basement. He erroneously attached the fuel oil hose to the wrong compartment in his truck, however, and pumped gasoline into the oil tank. When the delivery person went into the Petersons' basement to determine if the tank was full, he realized his mistake. He tried to "ladl[e] the gasoline out of the storage tank . . . with a bucket" and pour it back into the gasoline compartment of his truck. *Id*. at 481. He then drained the rest of the gasoline into a sewer in the basement using a small hose. After he had removed most of the gasoline, he prepared to pump fuel oil into the oil tank. Around this time, an explosion occurred, damaging the Peterson home and causing personal injury to Mr. Peterson and the delivery person.

Sinclair's automobile liability policy insured the delivery truck and contained the following relevant exclusion:

> It is agreed that ***the insurance afforded by the policy for bodily injury liability and for property damage liability does not apply to accidents arising out of*** the delivery of any liquid product into a wrong receptacle or ***the erroneous delivery of one liquid product for another, if the accident occurs after such***

31

***operations have been completed or abandoned at the place of occurrence thereof***. Such operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement.

*Id*. at 486 (emphasis added). The insurer argued that the phrase "such operations" in the exclusion referred to the mis-delivery of one liquid product for another. Thus, it maintained that, because the explosion had occurred after the delivery person had ceased mis-delivering the gasoline and was beginning to properly deliver the fuel oil, the mis-delivery was "completed" and the exclusion applied.

The court rejected this argument, concluding that the phrase "such operations" more reasonably encompassed "the total process of attempting to deliver petroleum products into their proper containers." *Id*. at 486-87. The court further reasoned that the phrase "abandonment and completion of 'such operations'" meant "a state of affairs where the driver of the truck physically leaves the unloading area, after erroneous delivery, thus creating a situation in which *an intervening instrumentality*, not insured by the driver's insurer, may provide a causal link in the chain leading to the accident." *Id*. at 487 (emphasis added). Because the delivery person still was on-site and in the process of attempting to correct the mis-delivery of the gasoline at the time the explosion occurred, the operations were not complete and had not been abandoned. Thus, the exclusion was inapplicable.

In the case at bar, like in *Peterson*, the discovery of the property damage to 1133 and 1137 arose prior to the "complet[ion] or abandonment" of the delivery. Over the course of 8 minutes and 16 seconds, Griffith's driver mistakenly pumped 330 gallons of heating oil

32

into the basement of 1135. Upon realizing his mistake, he stopped pumping the heating oil and called his dispatcher. His dispatcher, in turn, called Hall, who, as mentioned, was a claims specialist for Griffith. Hall arrived within thirty minutes to an hour. The driver remained on the premises until Hall arrived and for approximately an hour thereafter. Hall contacted MEI to begin assessing the damage and to remediate.

Based on these undisputed facts, the circuit court concluded that "the delivery [n]ever really ended in this case, because the disaster was discovered during the course of it; and it was never abandoned . . . it was dealt with." The AFD, which also was on the scene within an hour, determined that only about 15 gallons of the 330 gallons of fuel oil remained in the basement. The remaining 315 gallons had gone down the floor drain. That floor drain later was determined to empty below the concrete slab of 1135's basement. Thus, before "the driver of the truck [had] physically [left] the unloading area," more than 300 gallons of heating oil already were seeping into the ground beneath the basement slab of 1135. There was no "intervening instrumentality . . . [with] a causal link in the chain leading to the accident." *Peterson*, 123 N.W.2d at 487.

Moreover, the two facts Griffith relies upon in urging that its driver had "completed" delivery before any oil had spread to 1133 and 1137 are not material. First, it emphasizes that its driver had stopped pumping oil into the basement approximately four hours before any oil was known to have migrated outside of 1135. The "Wrong Delivery" endorsement may not be construed so narrowly as to preclude liability for any property damage that

33

becomes manifest after the driver has stopped pumping a liquid product, however. Just as the property damage to 1135 continued and worsened over the hours and days after the driver stopped pumping, so too did the damage to 1133 and 1137. The discovery of the presence of oil in the sump of 1137 a mere four hours after the mistaken pumping ended evidences that the property damage was occurring in the form of seeping and migrating heating oil contemporaneously with the wrong delivery. It also is worth noting that the environmental management firm hired by Griffith considered the presence of oil in the sump of 1137 to be evidence that heating oil already had spread beneath the slabs of the three houses in the triplex. Thus, property damage was occurring, though unseen and undiscovered, to all three houses caused by repeated exposure to same substance.

Second, Griffith observes that, while 1135 was condemned the day of the mis-delivery, 1137 and 1133 were not condemned until September 7, 2010, and September 22, 2010, respectively. The condemnation dates are not material, however. On the day of the accident, the AFD ordered the utilities shut off to all three houses. There was oil observed inside 1137 within hours. The VOC levels in the three houses, which were not tested until the following day, rendered all three houses uninhabitable. The owners of 1133 and 1137 faced an immediate loss of use of their houses, which was a form of property damage under the Auto Policy. This loss of use preceded the condemnation of the two outer houses by weeks and was an immediate form of property damage covered under the Auto Policy.

34

For all of these reasons, the mistaken pumping of heating oil into 1135 Colonial Avenue was an accident that triggered coverage under the Auto Policy and the property damage resulting therefrom was not excluded from coverage by the Completed Operations or the Wrong Delivery of Liquid Products endorsements. The property damage all arose from the use of an auto and was excluded from coverage under the CGL Policy for that reason. The Misdelivery endorsement in the CGL Policy did not restore coverage for the property damage because the property damage occurred during the mis-delivery, not after it had been completed or abandoned. Because the Auto Policy alone covered all of the property damages, the court did not err in ruling that the limits of that policy were exhausted. Finally, because the anti-stacking provision in the Auto Policy only is implicated if that policy and another policy both provide coverage for the same accident, which, for the reasons discussed, is not the case here, we need not determine whether the exception to the anti-stacking provision was met.

### III.

### Duty to Defend under Auto Policy

Griffith contends the circuit court erred in ruling that the Insurers owed no duty to defend under the Auto Policy and/or the CGL Policy, for three reasons. First, it argues that the settlement negotiations between it and the owners/residents of the three houses constituted a "suit" as that term is defined in both policies. Second, it argues that New Hampshire is estopped to deny its duty to defend because it did defend Griffith for more than

35

a year before denying coverage. Finally, Griffith maintains that if New Hampshire and National Union properly had allocated payments between them for the property damage to 1135 on the one hand and the property damage to 1133 and 1137 on the other hand, "neither the Auto Policy nor the CGL Policy would have been exhausted, and the duty to defend would have continued."[7]

We conclude that this issue is moot in light of our resolution of the indemnity issue. There is no dispute that, by letter of October 11, 2011, New Hampshire advised Griffith that the limits of the Auto Policy had been reached. Up until that time, New Hampshire had been defending Griffith and had paid $81,856.35 in attorneys' fees. (New Hampshire contends that it did so voluntarily, not because it owed a duty to defend under the Auto Policy.) All of the defense costs Griffith seeks to recoup in the instant litigation were incurred after October 11, 2011.

New Hampshire's duty to defend "ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements." Auto Policy, Section II. A. In light of our holding that the property damage arising from the mis-delivery of heating oil all was covered under the Auto Policy and was not covered under the CGL Policy, the limits of the Auto Policy *were* reached on October 11, 2011, and New

---

[7]Griffith argued before the circuit court that certain "investigation costs" paid by New Hampshire improperly were applied to exhaust the Auto Policy when those costs should have been treated as defense costs. The circuit court ruled that those costs were properly allocated. Griffith does not challenge that aspect of the court's ruling on appeal.

Hampshire's duty to defend, if any, terminated on that date. Thus, even if we were to hold that New Hampshire's duty to defend was triggered in this case or that New Hampshire was estopped to deny its duty to defend, Griffith would not be entitled to any relief. For this reason, the issue is moot and we decline to address it. *See Attorney General v. Anne Arundel Cty. School Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327 (1979) ("A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.").

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. CASE REMANDED TO THAT COURT FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY THE APPELLANT AND ONE-HALF BY THE APPELLEES.**